Scottwood Development Company v. Commissioner.
Scottwood Development Co. v. Commissioner
Docket No. 454-66.
United States Tax Court
T.C. Memo 1967-175; 1967 Tax Ct. Memo LEXIS 85; 26 T.C.M. (CCH) 855; T.C.M. (RIA) 67175; August 28, 1967
George V. Fisher, 297 S. High St., Columbus, Ohio, for the petitioner. Conley G. Wilkerson, for the respondent. TANNENWALD
Memorandum Findings of Fact and Opinion TANNENWALD, Judge: Respondent determined a deficiency in petitioner's income tax for the fiscal year ended March 31, 1963 in the amount of $9,745. Only one issue is presented for decision: Is petitioner entitled to capital gain on the sale of 47 houses to one buyer? Findings of Fact Some of the facts are stipulated and are found accordingly. Petitioner is an Ohio corporation and had its principal office in Columbus, Ohio, at the time of filing its petition herein. It filed its March 31, 1963 return with the district director of internal revenue, Cincinnati, Ohio. Prior to 1960, petitioner was engaged in the business of developing *86 land and constructing houses for sale. On or about March 31, 1959, petitioner acquired land in Columbus on which it constructed 50 homes during the summer and autumn. In the fall of 1959, petitioner embarked on an extensive sales campaign with respect to these houses. The houses all had the same basic floor plan and were advertised for $12,200. Because of unfavorable market conditions, only one house was sold at that time. Thereupon petitioner decided to rent the houses and to abandon any attempt to sell the remaining houses, except to follow-up a few prospects who were interested at the time but who were having trouble securing financing. Prior to this time, petitioner had never been engaged in the rental business. In January 1960, petitioner hired Paddock Realty Company to act as rental agent. After one year, petitioner replaced Paddock with another rental agent, Whit Dillon Realty, Inc. The houses were rented on month-to-month leases at $95 per month. This $95 rent was comparable to the rent of similar houses in similar locations. At that time, it was not the custom in Columbus, Ohio, for written leases to be executed with respect to rental property in the price range of houses *87 of the type involved herein. Neither of the rental agents had authority to try to sell the houses; their sole authority was to handle the rental of the houses. Except with respect to the two sales noted below, petitioner made no effort to sell any of the houses after January 1960. Nor did any person, on petitioner's behalf, attempt to sell the houses. The leases contained no option to buy. On April 11, 1960, one of the homes was sold to a family which originally responded to the 1959 sales campaign. The only reason for the delay in selling this home was that there was some difficulty in securing financing. On June 15, 1961, another home was sold. As in the case of the April 1960 sale, the buyer had originally responded to the 1959 sales campaign, but had difficulties securing financing. The buyer had rented the house during the period in which financing was arranged and the purchase price was adjusted to reflect the rent paid. In the spring of 1962, a representative of C. V. Perry and Company (hereinafter referred to as "Perry") inquired whether the houses were for sale and received a negative reply. Perry subsequently made three consecutive offers to buy the remaining 47 *88 houses. Petitioner turned down the first two offers, but accepted the third offer. Petitioner at no time attempted to solicit this or any other offer. The sale of the 47 houses to Perry was completed on June 15, 1962. The gross sales price was $474,700. Expenses of sale were $1,145. Petitioner's original cost was $468,383 and depreciation of $63,831 had been taken. Thus, the profit was $69,003. Petitioner reported the profit on the sale as long-term capital gain. Respondent determined that petitioner had held the houses primarily for sale to customers in the ordinary course of business and that they were therefore net capital assets. During the period 1959 to 1962, petitioner's primary source of income was the 50 houses. Although there were vacancies from time to time, each of the houses was rented during a part or all of such period. All rentals received by petitioner during this period were from this property. The following table reflects the approximate income and cash flow of petitioner from the rentals: Fiscal Year Ending
3/31/60
3/31/61
3/31/62
Rentals received
$ 3,754.50
$48,088.00
$47,381.00
Depreciation on the houses
7,723.19
29,857.00
26,708.40
Taxable income
(24,598.32)
(18,868.00)
(19,081.00)
Cash flow from rentals
*
( 2,436.28)
( 9,299.95)
*89 Petitioner claimed depreciation on its 1960, 1961, and 1962 Federal income tax returns. The depreciation for 1960 was allowed by respondent on audit of that return. Ultimate Finding of Fact At the time of their sale in June 1962, the 47 houses constituted property used in petitioner's business and were not held primarily for sale to customers in the ordinary course of that business. Opinion This case once again requires us to apply the oft-litigated language of sections 1221(1) and 1231 [1] and to decide whether property was used in the petitioner's business and was "held * * * primarily for sale to customers in the ordinary course of" that business. Though a determination of what events transpired is an important and often decisive element of decision, in the final analysis the essential question is the principal intent or purpose of petitioner which lies behind its actions. This is the teaching of , and our task is to determine whether petitioner is entitled to share in the legacy of that decision. Each case turns on its own facts; extensive citation of cases would therefore be pointless. The burden *90 of proof is, of course, on petitioner. We held that it has met that burden. We see no need to repeat our detailed findings of fact. We will simply outline the broad ground rules to be applied and the critical factors which influenced our decision. Petitioner concedes that its original primary intention was to sell the houses to customers in the ordinary course of business. However, petitioner contends that, in January 1960, it converted its holding to rental property and that it therefore had primarily an investment purpose at the time of the sale in June 1962. Respondent contends that the rentals were merely an expedient attempt to salvage some return from the houses until such time as the sales market for the houses improved and that petitioner never abandoned its principal intention to sell the houses to customers in the ordinary course of its business. Though the taxpayer's original intention is an element to be considered in determining the holding purpose at the time of sale, it is not decisive. E.g., ; . *91 Moreover, it is not necessary that the taxpayer fully abandon the original intention and substitute an entirely new intention. , does not decree such purity of purpose. It simply mandates that the new purpose be "of first importance." Similarly, the mere fact that the sale herein was a bulk sale does not by itself require a holding for petitioner; such a sale is only some evidence of purpose. . In , relied upon by the respondent, there appears to have been no hiatus between the termination of the taxpayer's construction and sale activities and the ultimate sale of property as a single unit, nor was there evidence of any other use of the property from which a change of primary purpose might be inferred. Cf. ; , modified on other grounds, (C.A. 5, 1963). Respondent also relies on (E.D. Mich., 1952), and , affd. *92 (C.A. 9, 1955). Aside from the fact that these cases were creatures of the pre-Malat v. Riddell era when the test of "substantial" rather than "primary" purpose was in vogue, they are clearly distinguishable. In both situations, the court found continuing efforts to sell through real estate brokers and therefore an intention to hold for sale throughout the entire rental period. Respondent seeks to undercut petitioner's claim that its primary purpose was to hold rental properties for investment by pointing to the fact that petitioner had both a taxable loss to use as a carryback and a negative cash flow for the years the houses were rented. The simple answer is that petitioner was getting the best return it could from the houses and that renting was intended to be more than a transitory palliative. The key elements herein are: (1) Throughout the two-and-one-half year period from January 1960 to June 1962, no sales were made except in two instances (neither of which occurred in the taxable year before us) where the genesis of the sales occurred prior to January 1960 and the sales were delayed only because of financing difficulties. (2) The real estate agents were only authorized *93 to rent. They had no authority to sell. The leases contained no reference to an option to buy. (3) Neither petitioner nor any other person made any effort on petitioner's behalf to sell the houses, nor were the houses advertised or listed for sale in any way. (4) The ultimate bulk sale developed from an unsolicited offer from the purchaser. Thus few, if any, of the normal indicia utilized in applying section 1221(1) are present. See, e.g., . By delineating the foregoing elements, we do not intend to convey the impression that they are necessarily determinative. Rather, we have based our conclusion upon the entire record herein, of which these elements are only an important part. It may well be that petitioner throughout the period from January 1960 to June 1962 also retained its original purpose to sell the houses. But, if so, it was dormant and, as we have already pointed out, primacy of purpose, not purity of purpose, is the touchstone of decision. We hold that long before June 1962 petitioner had either abandoned or sufficiently submerged its original purpose so that, by that date, it was simply using the houses in its *94 business within the meaning of section 1231 and was not holding them "primarily for sale to customers" within the meaning of section 1221(1). Decision will be entered for the petitioner. Footnotes
*. Not available.↩
1. All references are to the Internal Revenue Code of 1954.↩